Good morning, Your Honors. Elizabeth Newman for Mr. Bojorkes. Your Honors, the government's brief contends that Mr. Bojorkes was not eligible for 212c relief, and we can see that that's correct on further reflection, but that doesn't change that he was eligible for adjustment of status, just as we say in our brief, and just as we argued below. Now on appeal, the government has turned the adjustment of status issue into an issue about visa availability, and for the government on appeal, that's almost all that this case is really about, but they never mentioned visa availability below. They never litigated it below. They never mentioned it in their briefing. They never mentioned it in argument in the district court, and now they're asking this court to take judicial notice of some facts to support an argument that they never made below. We submit, Your Honors, that you shouldn't let them do that. We never got a chance to address their facts or their argument below because they never raised it. The district court never passed on it because they never raised it. And if they had raised it below, we could have addressed it factually. We can address it factually in a rather sketchy way now. Well, how do you address it now? In other words, that is one of the elements, right, of adjustment of status? That is one of the elements. Well, yes, Your Honor, that is one of the statutory elements of adjustment of status, but if we were to litigate it now, well, our position, Your Honor, is that remand is required in any case because the district court never passed on the prejudice issue, but the remand should be limited to a finding on the prejudice issue. However, if the court does take judicial notice of the visa availability, the visa bulletin, here's more or less what we perhaps, what we could say. We could say that the evidence could show that the visa availability issue is a non-issue because Mr. Bohorkes' life partner, Ms. Esquivel, was at that time of his deportation hearing a lawful permanent resident in the process of becoming a citizen. And the, she could have become a citizen. The record evidence shows she was in the process and wanted to, and he could have married her, and if he had done that, he would have had a visa immediately available without any waiting because he would have been the husband of a U.S. citizen under 8 U.S.C. 12, I'm sorry, 1151 B2A1. We never got a chance to put in that evidence, and we could put in something like that on remand, but what's really required as far as remand is concerned is a remand limited to the prejudice issue because the government never litigated that below, and it's trying now to litigate it for the first time on appeal. And without the visa bulletin documents, the government has nothing. It can't deny that Mr. Bohorkes should have been told that he was apparently eligible for this relief of for adjustment of status, and that's the only focus of the district court's inquiry, and the district court's inquiry really ought to end there. I would like to turn to Mr. Bohorkes. Didn't he actually need both forms of relief? Relief under 2, potentially need both forms of relief, relief under 2, 12C, and adjustment of status? No, Your Honor. That was an incorrect legal analysis on our part. He did not need to 12C relief because a weapons offense is not a crime of moral turpitude, as the government correctly points out. So as long as he, would adjustment of status grant him all the relief he needed? Yes, it would. What it would do is cleanse him of the weapons offense so that he could fictionally reenter the country as someone cleansed of that. Oh, it's a matter of fiction. Exactly. But that's all, that is all he needed. All he needed was, was, was adjustment of status. Yes, that's all he needed. He didn't need the 2, 12C relief at all. The government's other Well, how do you, he's still, you know, I'm still having a hard time. Is there another way to look at immediately, a visa is immediately available? What does that mean? Well, Your Honor, I know I'm on a little bit of thin ice with this panel talking about the Hernandez case. But if I mean, I struggled with that in the Hernandez case. We, we, we, we spent hours and days trying to figure out what that meant. Well, here's how I would We gave it our best shot. But that was different, a different facts. Very different facts. Yes, she already had, she was married and already had an approved long time before. Well, it was a different procedurally as well, Your Honor, because in, I mean, the way I think Hernandez can be reconciled with Bowie is to say that in Hernandez, what the court was saying was, if she needed it, she already had it. And not she needed it. But if she needed it, she satisfied that, that, that requirement. And the government didn't fight that. Whereas in Bowie, the, the issue was a little bit different. There the court said, yes, this young man should have been told of his apparent eligibility for 212H relief, which included an adjustment of status or, yeah, which included an adjustment of status petition. And if there were these theoretical roadblocks, as I think the court called it, as to immediate availability, well, that's something that the IJ should consider on remand. Now, we're not saying that you should remand this case so that Judge Letts can consider it on remand, because Bowie is procedurally very distinct from this case, because Bowie involves an IJ deciding whether to grant relief, either initially or on remand. But our case is at a different level. Here we're in the district court asking whether the IJ could plausibly have decided to grant relief. So we're one level removed. So the standard is different. It's only whether Mr. Bohorkes was informed of his apparent eligibility for this relief, and if not, whether the defect prejudiced him. And so I don't think that the court actually even really has to address the issue, excuse me, of whether the visa availability is an absolute requirement. But if it, because we're on, we're at this different level, and the government's not, the government's raising it only in this context and not somewhere else in the defect and prejudice analysis. But if it, if the court does decide that it is necessary, then it shouldn't take judicial notice of the visa bulletins. And if it does take judicial notice of the visa bulletins and remands, then we can present this evidence about an immediate visa available to him as the husband of someone who was in the process of becoming a U.S. citizen. Okay. I'd like to turn to the prejudice issue, because for the government, that's really the only other live, I mean, really live issue in the case, it seems. When this was going on, they were not married. I'm sorry, Your Honor? When this was going on, they were not married. They were not married. They have since done so. And she could, she was in process of becoming a citizen. They're still married. They have two children. And she visits him in Mexico every other weekend. So, I mean, this is a live and viable marriage. Well, I mean, if she's still married, if they're married and they have two children, why can't he go to the American, you know, Consul General near the border and get a visa? Because he's been deported, Your Honor. At least that's my understanding of the state of immigration law, that he, what we're trying to do here today is undo the criminal conviction, which in turn undoes. That keeps him down there. Right. Which he doesn't, he doesn't get priority on the visa. That's my understanding, Your Honor. Are they married now? Yes. And they got married when? I'm not sure, Your Honor. The record evidence doesn't show it. But turning briefly to the prejudice issue, the government says that we have to show outstanding equities. And I would dispute that. What we have to show is that there was a plausible ground, a plausible reason to believe we could show outstanding equities to an I.J. So it's a different, more attenuated analysis. And there is an INS case, a BIA case, that shows that two of the factors in our case are outstanding equities. And they are the length of residence here in the United States, despite the fact that much of that was without legal status. And his family life, his family ties, his partner, children, parents, grandparents, siblings, all of them here. That case is matter of Rodarte Espinoza, 21 INN Deck 150. It's a BIA case from 1995. And so I would like to bring that to the court's attention. And ask, no, it's our position, of course, that the district court never passed on the prejudice issue in the first instance. But if this court decides that in some way it did, it should find that the district court erred in its prejudice analysis and that we have met the prejudice burden. I would like to save any remaining time for rebuttal, Your Honors. Thank you. May it please the court. Eric Silber on behalf of the United States. Defendant argues that it's improper in this circumstance to take judicial notice of the visa bulletin. And the government respectfully submits that it's not the government's burden in this case, nor was it in the district court, to show the defendant was eligible immediately for a visa. It was defendant's burden to show that a visa was immediately available. You never raised that as a ground, you know, to deny eligibility. Did you in the district court? That is correct. Although why should the defendant have to contest a ground that wasn't raised? Well, two points, I think, that are relevant. First, given that it's the defendant who's claiming a right to relief under Section 245 of the Immigration and Nationality Act, it's defendant's burden to show the entitlement. And it's not up to the government to have to raise the lack of entitlement in that circumstance. I mean, this court routinely affirms. Well, once you decided to raise it, you should have raised it in the district court. I mean, why are you raising it now? You don't have to raise it. Well, I mean, I think it is an absolute bar in this circumstance. I note on the issue of the opportunity to contest this in the district court, defendant's own expert at ER 32 indicated that the defendant was taking preference as a family preference to be, which is the same preference. Who indicated that? That's defendant's expert. If you look at excerpt of record, page 32. Well, I mean, you know, just like you, he's changing the record. Well, but the only argument that's been raised here regarding that is that the defendant could have gotten married for immigration purposes, which is not a permissible basis to get a visa. I mean, if that had been done, it would have. I don't think she says for immigration purposes. She says it's a longstanding relationship. And she just said they could have gotten married. You've got two kids. Well, they do now. But at the time, first of all, there's nothing in the record to say they, in fact, have been married. And I do think that's important because even at the time of the hearing, there was no evidence of that. But you have to look back at this deportation happened nine years ago in 1995. At that time, they had really, the record suggests, met only about a year before that. She was pregnant with the first child, but had not had any children at that point. And the argument that was raised in the district court, because this point was made in the district court, that one of the IJ's failures was to not advise him to marry this individual who he was dating at the time. And that's just not a permissible basis to adjust the status, to get a visa based upon that. I mean, it would have been done in this context solely for immigration purposes. The only basis on this record in which the defendant, and I think backing up, by the way, I mean, we pointed this out in our brief that even if he did do that at the time of the deportation hearing, she was a permanent resident. And so even as a 2A preference category, he was not eligible at the time, and he remains not eligible under a 2A category. I mean, those are the issues that we face. You have to look at the time of the hearing, whether the defendant was eligible. I mean, the wording of Section 245 and 8 CFR 245.1G is it has to be immediately available. And at the hearing, there was no visa available to this individual. And again, it's defendant's burden to establish that. In Gonzales Valerio, this court indicated there the defendant. In other words, your position is this on that issue, even if what what Ms. Newman says is, you know, is can be supported by evidence. In other words, that, you know, he could have gotten married. That's not enough because he wasn't married. It's two prongs. First, he if he had got married simply for immigration purposes, you couldn't use that to adjust your status. You couldn't use that relationship, which is what he's saying should have happened at that hearing. Secondly, even if he had got married, his spouse would have been a legal permanent resident alien. So his preference category would have been 2A and in under the family, one is to be underway. If he takes it from his parents as an adult son, it would be to be. I think it's important to note that the 2A date that was in December 1995 was February 22nd, 1992, three years before the hearing. And again, as of today, it still has not reached the hearing date. Nine years after the hearing. It's only up to September 15th, 1997. What is which one? For the 2A preference category, which is what he's saying. I mean, again, they're saying they are suggesting that, well, his wife could have become a citizen down the road and then he could have claimed it as a spouse of a citizen. But I mean, you have to really look at the time of the hearing. It was undisputed at the time of the hearing that his at that time significant other was an LPR. And what you're saying is even if the defendant could have shown that, you know, he would have been eligible as the as the spouse of a permanent resident. A visa would not have been immediately available. Yes. And there was given the backlog from Mexico. There was no hope of that happening in the near future. Yes, it is. You could get a visa bulletin that shows that. Well, we the document we had to put in the record had the 2A preference category listed in it as well. I think we noted in our brief that we didn't believe he would be eligible as 2A in any event. And we also what's your argument on the plausible showing of the prejudice? Well, I don't think I do think that outstanding equities. I don't I don't believe Defense Council is contesting that outstanding equities are required. Just simply in the context, you only have to show plausible grounds. But I mean, I think in the context of outstanding equities, that that's difficult to do. As the First Circuit indicated in China, unfortunately, a number of grounds that you see, like length of residence, family in the United States, employment, home ownership, things like that are kind of garden variety equities. And this court indicated the same in Gonzales-Valeria. Now, the court didn't absolutely hold that in Gonzales-Valeria. It just pointed to the facts here and said this court and other courts have rejected showings that are much stronger than this. But I think in that context, it's important to recognize both the seriousness of defendant's offense and the nature of the factors the defendant cites. Turning first to the seriousness of the offense. It's important to judge this in the context of Section 245. I mean, it is true in Rastavadi, this court indicated that you look at the 212C factors, the matter of merit factors, when making the determination under adjustment of status. It's also important to recognize that unlike 212C consideration, which only applies to people who are deportable, many people who apply for adjustment of status have done nothing wrong. That's simply their way of getting legal permanent residence status. I mean, you're talking people who have no criminal background, nothing that disqualifies them from entry in the United States. So when you're looking in that context, defendant's very serious criminal conduct in this case takes on a much more significant role. And I think the BIA has indicated. I forget what his conviction. He was convicted on one count of assault with a firearm and he was charged with a second count as well. I mean, you have two instances of assault with a firearm that were part of the same criminal case. What were the facts? The PSR does not indicate any facts other than it was two different individuals that he assaulted in this circumstance. I don't know what that means. Well, I think the. Did he shoot people, wound them, kill them? Did he just wave the gun? Wave the gun. Well, I mean, I think by necessity to get convicted of assault, you would have to have have reasonably put them in fear in that circumstance rather than just having the. I'm not sure the answer to that. I mean, I do think. We're just sort of in the dark about what happened. I think the important thing to recognize is regardless of. You can't just come in there and play it. Well, but I think he can't, in the immigration context, challenge his conviction. So, I mean, he is he can't go before the BIA or IJ and say, well, I didn't do the facts or that, you know, it was I didn't do what I pled guilty to because the the IJ or the BIA has no authority as an administrative agency to question a state conviction. And in balancing the equities, can't they look at the underlying circumstances? I think they can look at the underlying circumstance, but I think it's important to recognize in the context of this case, this is a conviction, this firearm conviction that the Congress has treated very seriously. In fact, so seriously, there is no grounds for deportation, really, from deportation in this context. And the only way that the defendant is even eligible for this is through the adjustment of status remedy, which in some ways thwarts Congress's intent, which the IJ would have been able to weigh here. I mean, this was a very serious offense by Congress's definition because it involved a firearm and firearm offenses, as Congress has defined in the statute. How old was he when this when this when he was convicted of this offense? I believe he was 24. Give me a moment, your honor. And at that time, how long had he been in the country? I believe he entered approximately 1971. I believe the date of the offense was when the date of conviction was 224 92. So he'd been in the country approximately 20 years, 21 years. He had several children. Well, I think it's important to recognize that fact. I mean, I was focusing on the conviction for a second, but he had several children, didn't he? Well, I think we have to look at the nature of that. He had two children at the time, but the other woman was pregnant. Well, no, that came later. Well, she was pregnant at the time of the deportation. But I think focus focusing first on the two the two children that he had with his ex-wife. The PSR indicates that paragraph 21 that his wife had left the United States with the two children by the time of the deportation hearing. And in fact, the defendant indicates that that's why he didn't really contest the deportation charges, because he had a hopelessness of seeing the kids again. Well, if the kids are not in the United States, they do not support granting adjustment of status. It can't really be considered a significant equity. I mean, at the time they were living in Panama, which does not aid his case here. Do we know why they were living in Panama? Doesn't indicate in the PSR. And again, looking to the nature of the relationship he had with his wife from Panama. It doesn't say in the PSR, it just indicates that she took the children to Panama and he had kind of a hopelessness around that situation. There's no further explanation in the record regarding that. I believe he is from Mexico. And so I think I mean, I think that, again, it's recognizing that it's outstanding equities that are required. That downplays that a little bit. Turning to his significant other that he had begun dating, we point out in our brief, he only began dating her after immigration proceedings, or at least around the same time immigration proceedings were commenced against him, which significantly downplays the significance of that factor. Well, it would be. Love knows no barriers. That is, that is true. But it is traditionally that factors that come into play after you, immigration consequences attached are entitled to diminished weight. And I don't think it's not that his love is entitled to diminished weight. It's simply given the context of the deportation proceedings, this particular fact in the outstanding equities inquiry is entitled to diminished weight. And I mean, it's important to recognize. I see that I'm over my time. It is important to recognize that it is outstanding equities. And so, I mean, you really it really is important to establish not just that you have facts like family here, but that they rise above significantly above kind of the other cases. I mean, for Ayala Chavez, for example, which this court cited in Gonzalez Valerio as one of the examples in which had been denied. I mean, there you had someone who had family here, had a child, had been in LPR for 18 years, had arrived in the United States at age nine. And that was substantial equity, but not outstanding. And I think it's in the context of the difficult burden the defendant faces, these kind of factors that diminish the family circumstances that were present here make it what about this concept of family values that we hear a lot about families together? Well, I mean, I think that certainly is the basis of our civilized society. We hear this every day, don't we? And I think that this process and from the attorney general, though, I think that's right. And I mean, I think this process recognizes that. I mean, part of the reason that it allows this kind of discretionary relief is to allow kind of families to stay together. But it does require the kind of equities to be outstanding when you have the serious criminal offense. I mean, it was defendant's crime that put him in the situation that he's in now. I mean, that's what triggered the deportation and triggered him having to come up. But if we're going to balance equities and we don't even know what the facts are that surrounded this offense, how are we going to do that? Well, I think it's important. I mean, as I indicated, the defendant can't really challenge his offense. But to the extent defendant wanted to come forward with some reason why the firearm offense was different than kind of other firearm offenses, I mean, it's defendant's burden to establish the plausible grounds to the extent defendant didn't do. I want to ask you just two minor questions. One, I gather your position is, just to sum it all up, is that you probably would agree with the defendant that at the hearing, based on what the I.J. knew, he should have advised the petitioner that he could apply for relief under, or he'd apply for adjustment of status. I think that's probably right. I mean, it's a little circular. So your whole argument really focuses on the prejudice prong. Well, it's somewhat circular because, I mean, I would expect an immigration judge to know that Mexico is a backlog country and therefore that he would not, in fact, be able to adjust his status. So to some extent, it is circular because the fact that he's not able to get a visa immediately suggests that no notice would be required in that circumstance because there's really no way. Exactly. So, I mean, to some extent. Let me ask you this, did the INS ever have a practice where they would let the application sort of sit for a while until visas became available? No, and in fact, it's just the opposite. 8 CFR 245.282 indicates that they will not accept the application for adjustment of status if a visa is not immediately available. So who does the petitioner file the visa with, with the IJ or with the INS? I believe you have to, I actually believe it's with the State Department, although I could be wrong about, I mean, ultimately, it's the State Department, I believe, that issues the visa, not the INS. Once he became available, once the visa. So the judge, so let's just, I want to make sure I understand. So if the IJ had told him, you have the right to apply for adjustment of status, is that something you want to pursue? And I gather the IJ would have continued the hearing and allowed him to submit an application. I think that theoretically could happen. I think it's important to recognize that under the statutes 242, 8 CFR 240, excuse me, regulations 8 CFR 242.13, you really can only have a reasonable adjournment of the proceedings. And given that nine years later, it still hasn't reached even close to his kind of eligibility date. I mean, essentially what defendant would be asking is for an indefinite suspension of deportation proceedings. I mean, I do think the Second Circuit in Drax indicated that a short adjournment of the proceedings would be appropriate. And there it was 15 months. The defendant's appeal in the normal course of things wouldn't have even been decided by the time he was eligible. I think this court has indicated the same thing in Maturo. This court said, quote, both the special inquiry officer and the Board of Immigration Appeals denied his motion because he was statutorily ineligible as there were no immigrant visas immediately available or likely to become so in the near future. We agree. And I mean, I do think there's a suggestion if one is about to become available, maybe you could add that you would need to advise about the right. And you need to take this, get this continuance, go do these things. But that's simply not the case here, because unfortunately, Mexico is a very backlog country. And there really was no hope of getting this either at the time of the hearing or any kind of reasonable time. I thought that if an illegal alien married an American citizen, that that alien was immediately eligible for a visa and that all I had to do was to leave the country, go to a port of entry, not Tijuana, but there's another one, I forget the name, and just apply for it. You could get it like that and then come back in. Well, I do believe as a spouse of a citizen, he would be exempt from the visa, the immediate visa requirement. But I think there's two problems ordinarily. There's two problems with that. If there's a spouse of a citizen, they go down to get the visa. Don't they just get it right away? Well, he couldn't do that in this context because he was in a deportation proceeding. He could have. I'm just asking you generally. I believe generally he could have filed an adjustment so he wouldn't have had to leave the country. He could have filed an adjustment of status based on a request to adjust status based on the relationship with his wife. If he were not in deportation proceedings, he would simply have filed that with what was then the INS. But if he'd gone to, if he'd crossed the border and then gone to a council, American councilor in Mexico at the border, he'd have gotten a visa. Well, I think he could have done that as well. I mean, I, but the problem is that once he, he was not married at the, there are two problems as far as the time of his deportation. One was that he was not married. And the second was the person he had begun dating at that time was not a U.S. citizen. She was an LPR. And once deportation proceedings started, there is a presumption that you cannot adjust based on marriage to a U.S. citizen. And you have to show it's for good faith and not for immigration purposes. And I don't think that this record establishes that. In fact, quite the contrary to U.S. citizen or an LPR. A U.S. citizen. I apologize if I was unclear about that. It is marriage to a U.S. citizen, which, well, I think, let me back up. It's actually, what triggers this requirement in a deportation proceeding is marriage, period, adjustment based upon marriage. It's relevant to this inquiry because citizenship gets, marriage to a citizen gets you more rights than marriage to an LPR does. But ultimately, if you get married in a deportation proceedings, there's essentially a presumption that it's done for immigration purposes. And so you really have to show good faith and you have to show it was not done for immigration purposes. On this record, there's no showing of that. I mean, there's no even showing that he ever got married to the individual. Even at the time, seven years later, this was done in the district court, which I think belies the suggestion would be done for anything but immigration purposes. And in fact, they were not married. I mean, the only reason he would be doing it, as he states, is to adjust his status, which would bar the relief. If the panel has no further questions, the government would submit. Your Honor, the government's argument shows the necessity for a remand in this case because it points out what's not in the record, what was never, what the defense was never given a chance to develop in the record because the government never raised the visa availability issue ever, not once, below. But to address the sort of thing that might be put into the record on a remand, first of all, the government is incorrect in saying that Ms. Esquivel was pregnant with a first child at the time of Mr. Bohorkes' deportation hearing. She had already given birth to a first child, and she was pregnant with a second child. He tells the immigration judge himself that his children are seven, nine, and four, and that his girlfriend is pregnant. He had two children with his first wife. He was divorced from her. And so the youngest of his existing children at that time was his first child with Ms. Esquivel. But he wasn't married at that time. He was not married at that time. However, she was in LPR, as the government says, and the only evidence in the record, I mean, the evidence in the record does establish that she was in the process of becoming a citizen at the time of his deportation hearing. The government has said rather a lot about the presumption surrounding a marriage that's contracted during the pendency of deportation proceedings. But that presumption is rebuttable, among other things, by the fact of the birth of children, which shows the legitimacy of the relationship. And the case law says that as long as a marriage is based on an actual and nothing to rebut because there's no marriage. No, Your Honor, you're right. But had he been adequately advised during his deportation hearing that this was a ground of relief and had he had, I mean, had he understood that these were the statutory requirements for getting relief, then he could have taken all of these other steps. He could have married her the next day. They had a child already. Another was on the way. He would have immediately been eligible for a visa under 1251 B2A1. Furthermore, it's simply not the case that the I.J. couldn't have or wouldn't have. That's a long line for that visa. No, Your Honor. That's the visa that's immediately available as the spouse of a U.S. citizen. Oh, I see. But she wasn't a citizen. She wasn't. But the I.J. could easily have put the hearing over. That very commonly happened, as Your Honor suggested. How long ago? Well, Your Honor, she was in the process of becoming a citizen. We don't know how long. How long was the waiting line for the visa? Your Honor, the visa that I'm talking about, there would have been no waiting line for. If they'd been married. If they had been married. When did she become a citizen? I'm not sure, Your Honor. There's no evidence in the record about it, and I don't have any outside evidence about that either. I'm sorry. But she was, what the evidence in the record does show from his declaration that was submitted to the district court, was that she was in the process of becoming a citizen. Did you ever ask your client when his wife became a citizen? Your Honor, I don't know when she became a citizen. I'm sorry. Let me ask a little different question. Following up on what the Judge Ferguson asked Mr. Silver, you put it, put anything in the record, you know, to sort of ameliorate the effect of these firearms assault convictions? Some argument you can make that it's not as bad as it might appear on the face of it? I don't have any other evidence or any other facts to adduce other than what's in the PSR, which just shows a bare fact of assault with, you know, of assault with a firearm, the conviction. But I think the government is incorrect in saying that a firearms conviction is such a serious and terrible thing that the BIA makes it a deportable offense and not an excludable offense. The BIA, isn't it Congress did it? I'm sorry. The BIA, the Congress did that because the BIA accepts that you can cleanse yourself of the taint of a firearms offense through adjustment of status. That's normal for the BIA. It's done so before. Matter of Rainford, I believe, is the case that we cited in our briefs. And there are a lot of factors that would weigh in favor of a discretionary. Did you put any of those factors into the record in favor of this area? There are factors in the record. Yes, Your Honor. That go to the assault with a firearm conviction. Ah, no, Your Honor. Only that balance out any taint that might arise from the assault with a firearm conviction. His length of time in the country, although the First Circuit may think that these factors are garden variety, this circuit has taken a different view. In Jimenez Marmolejo, Pallades Galan, 24-year residence, a 20-year residence. That's what we had in this case. This is a person who came to this country at the age of one and at the time of his deportation hearing was 25 years old. So he had lived here just as long. And it doesn't matter that some of that time was spent without documents. His family was here, his life partner, children, brothers and sisters, parents and grandparents. Jimenez Marmolejo says that's important. Ubaldo Figueroa says that's a substantial family tie, a substantial factor, a weighty factor. Pallades Galan says that as well. These are outstanding equities in this circuit. He'd also been here since a very early age. Jimenez Marmolejo says that's very important. His work history is something that did not exist in, um, in Gonzales Valerio. He'd worked since the age of 16 to support his parents, his wife, his partner and his children. There's no record of public assistance. Ubaldo talks about gainful employment. Pallades Galan says the same and talks about never having resorted to public assistance. He had rehabilitation as well. He bonded out of INS custody. He worked. He went to community college. He reported faithfully. He appeared at all hearings. And, I mean, so there are a lot of factors in the record that could have balanced this out. But the broader issue in stepping back is that this shows the necessity of a remand, at least on the prejudice issue. And if the court is inclined to take judicial notice of the visa bulletin information, then a remand so that we can present record evidence and contest it in a way that we were never given a chance to before, because they never raised it before. They're litigating this for the first time on appeal. I submit that that's improper and they shouldn't be allowed to do it. But if the court is going to allow that, then it should remand so that we can join issue as to it below. Thank you, Your Honors. Thank you. It's now a matter of 20 minutes, and we come to number three on the calendar, U.S. versus David Andrew Gonzales.
judges: Pregerson, Tashima, Paez